UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Crim No.  06-193 (RBW) |
| : | |
| TERRY DAVIS, : | |
| : | |
| Defendant. : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MEMORANDUM
AND PROFFER IN SUPPORT OF HIS MOTION TO MODIFY HIS CONDITIONS
OF RELEASE AND TO ORDER HIS RELEASE ON PERSONAL RECOGNIZANCE

The United States, through undersigned counsel, files its opposition to defendant Terry Davis's memorandum and proffer in support of his motion to modify his conditions of release and to order his release on personal recognizance.  As demonstrated further below, the government respectfully submits that the Defendant should remain in custody pending sentencing because he has not demonstrated – and cannot demonstrate – that, if released on bail prior to sentencing, he is not likely to flee or pose a danger to the safety of any other person or the community.  More particularly, given the serious nature of the criminal convictions, the likelihood of substantial incarceration, and the Defendant's deliberate perjury at trial, the Defendant cannot demonstrate by clear and convincing evidence that he will respect a lawful order to return to court for sentencing.

## FACTS

From July 1999 through June 2003, the defendant Terry Davis was the elected National Treasurer of Phi Beta Sigma, an international fraternity.  In that role, he had responsibility for the management of all funds entrusted to the fraternity.  The fraternity had two anti-fraud provisions in place to prevent embezzlement and unauthorized expenditures: first, all expenses

were to be approved by the National Treasurer, the National President, and the National Executive Director of the fraternity. Second, all fraternity checks required two signatures: one from the National Treasurer and one from the National President. From January 2001 to 2003, Davis wrote unauthorized checks out of the fraternity's operating account to cash, which he then deposited into his personal bank account and spent as if it were his own money. He did so by forging the required second signature of the fraternity's National President or simply negotiating checks with only one signature. In order to disguise the fraud, Davis would often, but not always, falsely write in the memo line of the check that the money was for a payroll transfer.

Mr. Davis was charged with ten counts of bank fraud, in violation of 18 U.S.C. §1344, one count of theft in the first degree under the District of Columbia Code, in violation of 22 D.C. Code §3211(b)(2), and one count of fraud in the first degree, in violation of 22 D.C. Code §3221(a).

On April 23, 2007, trial began in this matter. At trial, the government called as witnesses, among others, the four principal officers of the fraternity during the relevant time period: Donald Jemison (the National Executive Director from 2000 to the present); Arthur Thomas (the National President from July 2001 through July 2005); Peter Adams (the National President from July 1997 through July 2001); and Jimmie Hammock (the Defendant's successor as National Treasurer from July 2003 to the present).

Messrs. Jemison, Thomas and Adams testified that the Defendant had no authority to issue checks made payable to cash. Each also testified that, until at least the Spring of 2003, they were unaware that the Defendant had issued checks made payable to cash on the fraternity's account, forged the names of Thomas and Adams to the checks, and deposited the proceeds of

many of the checks into his personal bank account. Messrs. Thomas, Adams and Jemison further testified that they had not authorized the Defendant to sign ot print their names on the bank signature cards at Industrial Bank, *see* Government Ex. 17 at pp. 1-4, and were unaware that the Defendant had forged their names to the signature cards until shortly before trial. Further, Mr. Thomas testified that the Defendant told Thomas in the Spring of 2003, when Thomas confronted the Defendant about the checks to cash, that the Defendant wrote the checks to cash to transfer funds between the fraternity's general fund account and its payroll account. A review of the fraternity's payroll account records, *see* Government Ex. 16, demonstrated no deposits of the checks made payable to cash into the fraternity's payroll account and less than $20,000 of non-electronic fund transfers into the account during the relevant time period, *see* Defense Ex. 2.

  Mr. Hammock testified about three conversations he had with the Defendant. First, like the other three fraternity officers, Hammock testified that when he confronted the Defendant about the checks to cash in the Spring of 2003, the Defendant told Hammock that (1) the checks to cash were to transfer funds between the fraternity's general fund account and its payroll account, and (2) Thomas had given the Defendant "electronic signature" authority to issue the checks. Second, Hammock testified that he had a conversation with the Defendant at the fraternity's conclave in July 2003 in which Hammock asked the Defendant to send him the fraternity's financial records; Hammock testified that the Defendant subsequently sent him two boxes of unwritten checks and reports of other board members, but no other financial records (including account statements and canceled checks). Third, Hammock testified that he had a conversation in August 2003 in which the Defendant (1) repeated his earlier statement that the

checks to cash were to transfer funds from the fraternity's general fund account to its payroll account, and (2) asked Hammock what it would take to make the matter "go away" after Hammock told the Defendant that the Defendant's explanation for the checks to cash, *i.e.*, that they were transferred into the fraternity's payroll account, was demonstrably false.

In his defense, the Defendant called his wife, Rhonda Davis. His wife testified, among other things, that the standard of living enjoyed by the Davises did not change between January 2001 and June 2003. She testified on direct examination that during that time period the Defendant had left his job in Washington, D.C. at Trizec Hahn (a property management firm) for a job in Memphis, Tennessee. On direct examination, she did not mention any period of unemployment experienced by the Defendant between his job in Washington, D.C. and his new position in Memphis, Tennessee.

On cross-examination, Mrs. Davis explained that, during the two and a half year period when their standard of living did not change, she was not fully employed until the Fall of 2002 (having worked in temporary positions until that time). She also testified that she was unaware of any other source of income received by the Defendant between his job at Trizec Hahn and his new position in Memphis, Tennessee. She initially testified that her husband had been unemployed between his job at Trizec Hahn and his new job in Memphis for a "very short" or "very brief" period of time.[1] Following a bench conference, during which the government expressed its intent to confront Mrs. Davis with benefits checks received by her husband from the District of Columbia Department of Employment Services for the period from May 2002

---

[1] Because counsel does not have access to the transcripts of testimony, the recitation of the facts is based on counsel's notes and recollections of the witnesses' testimony.

through January 2003, Mrs. Davis testified that she knew her husband had been unemployed for several months before obtaining the new job in Memphis, Tennessee.

The Defendant also testified on his own behalf, attempting to fill the void left by his wife's testimony and to refute the testimony from the four fraternity officers.  Apparently having observed his wife's remarkable testimony that their standard of living had not changed during a time period when neither of them had full-time employment, the Defendant testified that he had earned income in the Spring of 2002 through a severance and his preparation of tax returns.  The Defendant offered no documentary support for his testimony about his purported severance or income from his tax preparation services.  His testimony about his outside income from the tax preparation services contradicted his wife's testimony that he had no other employment income between his job at Trizec Hahn and his move to Memphis, Tennessee.  His testimony also contradicted the records of the District of Columbia Department of Employment Services that reflected, among other things, that the Defendant had represented to Employment Services that he had no outside income, including a severance, during the period from April 2002 through January 2003.[2]

As to the testimony of the four fraternity officers, the Defendant's testimony flatly contradicted each of them.  Contrary to the testimony of Messrs. Jemison, Thomas and Adams, the Defendant testified that (1) Thomas and Adams had authorized him to sign (or stamp) their names to the checks, and (2) Jemison, Thomas and Adams had authorized him to sign or print

---

[2] Copies of the benefits checks from the Department of Employment Services to the Defendant are attached hereto at Exhibit A.  A copy of the summary sheet on file at the Department of Employment Services reflecting the Defendant's representations to the Department of Employment Services that he had no outside income, including a severance, between April 2002 and January 2003 is attached hereto at Exhibit B.

their names on the bank signature cards at Industrial Bank. Contrary to the testimony of Messrs. Thomas and Adams, the Defendant testified that both National Presidents knew that (1) the Defendant was writing out checks made payable to cash, (2) the Defendant was depositing the checks made payable to cash into his personal bank account, and (3) the Defendant was using the proceeds from the checks made payable to cash to reimburse himself for legitimate fraternity expenses, which Messrs. Thomas and Adams had purportedly approved by initialing receipts for such expenditures. Other than a single personal check made payable to a postage company, the Defendant offered no documents or witnesses to corroborate his contention that he spent the proceeds from the checks made payable to cash ($241,000) on legitimate fraternity expenses.

The Defendant also flatly contradicted the testimony of Jimmie Hammock. The Defendant testified that he sent all of the receipts for his purportedly reimbursed expenses (which the Defendant testified had purportedly been initialed by the former National Presidents) to Hammock following the fraternity's national conclave in July 2003. The Defendant testified he kept no copies of the records he purportedly sent to Hammock.[3] The Defendant also denied having any conversation with Hammock after the conclave in July 2003.

On May 3, 2007, following an eight day jury trial, the jury returned guilty verdicts on eight of the ten bank fraud counts, the theft in the first degree count and the fraud in the first degree count. Following the guilty verdicts, Judge Leon, sitting by substitution for the purpose

---

[3] As the Court has correctly noted, the Defendant purportedly sent his only copy of those supporting documents to Hammock at a time when the Defendant had already been suspended as National Treasurer by the fraternity and openly questioned about his misuse of the fraternity's funds.

of accepting the verdict, revoked the Defendant's personal recognizance status and ordered that the Defendant be detained pending further review by this Court.

## ARGUMENT

### THE DEFENDANT CANNOT DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT HE IS NOT LIKELY TO FLEE OR POSE A DANGER TO PERSONS OR THE COMMUNITY

The Defendant's contention that his post-conviction detention status should be based on the Defendant's purported conformance with his pre-trial release conditions, *see* Def. Mem. at 1-2, does not account for what has happened since the trial began on April 23, 2007. Most importantly, the Defendant has now been convicted of ten felony offenses. Upon conviction, under the applicable statute, a federal district court

> shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c).

18 U.S.C. § 3143(a)(1).[4] The statute therefore imposes a presumption in favor of detention. *See United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). The Senate Report recommending passage of the Bail Reform Act of 1984 reflected a strong policy on the part of Congress favoring incarceration upon conviction. *See* Report of the Committee on the Judiciary, United States Senate, 98th Congress, 1st Session, Report No. 98-225, p. 26 (1983) ("release of a criminal

---

[4] The government's preliminary guidelines calculation puts the Defendant at a total offense level of 23 (46-57 months) based on the following: 7 (Base Offense Level - U.S.S.G. § 2B1.1(a)) + 12 (Loss Greater than $200,000 - U.S.S.G. § 2B1.1(b)(1)(F)) + 2 (Abuse of Position of Trust - U.S.S.G. § 3B1.3) + 2 (Obstruction - U.S.S.G. § 3C1.1).

defendant into the community after conviction may undermine the deterrent effect of the criminal law, especially in those situations where an appeal of the conviction may drag on for many months or even years").

While 18 U.S.C. § 3142 governs pretrial release as opposed to release after conviction pending sentencing, the Court may also look to factors listed in Section 3142(g) to determine whether a defendant subject to Section 3143(a) is not likely to flee or pose a danger to the safety of any other person or the community. *United States v. Tann*, 2006 WL 1313334 at *4, Cr. No. 04-392 (CKK) (D.D.C. May 12, 2006) (citing *United States v. Vance*, 851 F.2d 166, 169-70 (6th Cir. 1988) and *United States v. Majors*, 932 F. Supp. 853, 855 (E.D. Tx. 1996)). These factors include the nature and circumstances of the offenses charged, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). These factors support the Defendant's continued detention pending sentencing.

Here, the Defendant was charged with and convicted of ten felonies involving extensive fraud at a non-profit organization over a two and a half year period stretching from January 2001 through June 2003. These felonies involved the Defendant's use of forged checks and falsified bank signature cards to gain positions of trust with the fraternity and the banks so that he could access their finances and fraudulently transfer over $241,000 of the fraternity's funds either to himself or his personal bank account. Those factors demonstrate that the Defendant is not particularly trustworthy. Further, the weight of the evidence against the Defendant was overwhelming, including each of the forged checks, the forged bank signature cards, the

Defendant's personal account statements showing the deposits of most of the proceeds from the forged checks, the Defendant's debit card records and personal checks showing the expenditures of the proceeds on his and his wife's personal expenses, the Defendant's false exculpatory statements about the checks to cash being issued to transfer money into the fraternity's payroll account, his wife's remarkable testimony that their standard of living did not change during a several month period when neither had a full-time job, and the testimony of the four fraternity officers demonstrating the Defendant had no authority to issue or cash the checks.

In addition, the Defendant's contention that he has satisfied his burden for release through "his unabridged compliance with the prior orders of the Court," *see* Def. Mem. at 2, ignores the pre-trial release condition that he commit no further crimes.  Here, in the government's view, the Defendant committed perjury by falsely testifying at trial that (1) he had outside sources of income during his period of unemployment, (2) the fraternity officers authorized him to sign their names to the checks made payable to cash, (3) the fraternity officers authorized him to sign their names to the bank signature cards, (4) the fraternity officers knew he had been issuing checks made payable to cash, (5) the fraternity officers knew he was depositing the proceeds of the checks into his personal account, (6) the checks to cash were to reimburse the Defendant for legitimate fraternity expenses, (7) the Defendant sent the receipts for the purportedly legitimate fraternity expenses and the other financial records of the fraternity to Jimmie Hammock, and (8) the Defendant had no conversation with Jimmie Hammock in which the Defendant asked what it would take to make the matter "go away."  There is also a serious question as to whether the Defendant suborned perjury by sponsoring the testimony of his wife that their standard of living had not changed, despite knowing that he had been unemployed

during an eight month period of that time. Taken together, the testimony demonstrated that the Defendant has little respect for our legal system and, therefore, undermined any assurance offered by the Defendant that he will return to Court for sentencing or not further engage in illegal acts. *See United States v. Bonavia*, 671 F. Supp. 752, 753-54 (S.D. Fla. 1987) (defendant detained pending sentencing based on, among other things, his attempts to suborn perjury during the trial); *United States v. Light*, 599 F. Supp. 874, 876 (E.D.N.Y. 1984) (defendant detained pending sentencing because "[h]is deliberate perjury at the trial of this case makes this court hesitate to rely on his assurances that he will not flee and will not engage in illegal transactions").

## CONCLUSION

For the foregoing reasons, the government respectfully submits that the Defendant's motion to modify his conditions of release and to order his release on personal recognizance should be denied.

                              JEFFREY A. TAYLOR
                              UNITED STATES ATTORNEY

By:         /s/
            Michael K. Atkinson
            ASSISTANT UNITED STATES ATTORNEY
            555 Fourth Street, N.W., Room 5915
            Washington, D.C. 20530
            Ph. (202) 616-3702
            Fax (202) 307-2304

DATED: May 8, 2007