UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. 06-193-01 (RBW) |
| | : | |
| v. | : | |
| | : | |
| **TERRY DAVIS,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

    The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, hereby submits this memorandum in aid of sentencing of defendant Terry Davis. Following an eight-day jury trial, the defendant was convicted of eight counts of bank fraud (18 U.S.C. § 1344), one count of first-degree theft (22 D.C. Code §§ 3211(b)(2) and 3212(a)), and one count of first-degree fraud (22 D.C. Code § 3222(a)(1)). As discussed below, the government requests that the Court impose a sentence at the high end of the applicable United States Sentencing Guidelines range of 41-51 months, impose a five year term of supervised release, and require the defendant to pay restitution in the amount of $241,000. The government also requests that the Court impose a sentence at the high end of the applicable D.C. Guidelines range of 6-24 months, but leaves to the Court's discretion whether that sentence should run concurrently or consecutively with the federal offense.

## FACTUAL BACKGROUND

On October 19, 2006, a twelve-count Superseding Indictment was filed against the defendant charging him with the following: ten counts of bank fraud (Counts One through Ten), in violation of 18 U.S.C. § 1344; one count of first-degree theft (Count Eleven), in violation of 22 D.C. Code §§ 3211(b)(2) and 3212(a); and one count of first-degree fraud (Count Twelve), in violation of 22 D.C. Code § 3222(a)(1). *See* Presentence Investigation Report ("PSR"), at p. 3, ¶ 2. On May 3, 2007, a trial jury returned a verdict of guilty on Counts 1, 3 through 9, 11 and 12. *Id.*, ¶ 4. Sentencing is now set before the Court on August 7, 2007, at 9:00 a.m. *Id.*, at p. 1.

According to the PSR, at pp. 3-4, ¶¶ 6-18, and the evidence established at trial, at all relevant times the defendant was the elected National Treasurer of a fraternal organization, Phi Beta Sigma ("PBS"). PBS's affairs were governed by a national board of seventeen individuals, eight of whom were elected officers, including a National Treasurer and a National President. Elected officers were chosen every two years at national (or international) meetings of the fraternity, called "conclaves." Additionally, PBS employed a professional staff at its headquarters in Washington, D.C., for the purpose of administering the day-to-day affairs of the fraternity. The National Executive Director was the head of this professional staff.

PBS received its operating capital generally through the assessment of members' dues and other assessments. PBS deposited those funds into a general fund account, located initially at an account at First Union Bank in Virginia and, later, at the Industrial Bank in Washington, D.C. The Federal Deposit Insurance Corporation insured the deposits of Industrial Bank and First Union Bank. The professional staff members of the fraternity, working at its headquarters in Washington, D.C., collected the funds and deposited them into the general fund account.

PBS paid its legitimate expenses after the professional staff prepared a voucher detailing the item to be paid. As a general financial control, the fraternity required the vouchers to be approved in writing by the following three officers: the Executive Director, the National Treasurer, and the National President. After those officers approved the vouchers, the National Treasurer would prepare a check, using the general fund account, to pay the expense. As a fraud prevention measure, each check required the signatures of both the National Treasurer and the National President. After preparing and signing the check, the National Treasurer was required to forward the check to the National President for his signature. The National President would then route the check to the national headquarters in Washington, D.C. for mailing.

The general membership of PBS elected the defendant as National Treasurer at the July 1999 national conclave. The general membership reelected him to a second, two-year term in July 2001. He was replaced as the National Treasurer at the July 2003 national conclave.

Between from at least January 2001 through June 2003, in the District of Columbia and elsewhere, the defendant knowingly engaged in a scheme and artifice to defraud First Union Bank and Industrial Bank, and to obtain money belonging to and under the custody and control of them, by means of false and fraudulent pretenses, representations, and promises. The defendant, without the authorization or knowledge of the responsible members or staff of PBS, would steal money from the PBS general fund account at First Union and Industrial Bank by writing checks to cash, which he would then negotiate by means of his personal account at the Bank of America. In order to circumvent the requirement of a second signature of the National President, the defendant would present checks containing the forged signature of the National President, or simply negotiate the check without the required second signature. The defendant would also have the monthly account

statements of the PBS accounts, which would reflect the defendant's checks to cash, sent to his home address in Virginia in order to prevent detection. Moreover, the defendant would often falsely represent, on the memo line of the checks and to responsible officials at PBS, that checks to cash were written to fund legitimate PBS activities and funds transfers, whereas, as the defendant well knew, the checks were used for his own personal benefit. The defendant also forged the signatures of the fraternity's officers to the bank signature card for the general fund account at Industrial Bank and falsely represented to the bank that the number of required signatures on the account had been decreased from two signatures to one signature, whereas, as the defendant well knew, he had no authority to forge the officers' signatures or to reduce the number of required signatures on the account.

In the government's case-in-chief, it called four former or current officers of Phi Beta Sigma: (1) Peter Adams (National President, July 1997- July 2001); (2) Arthur Thomas (National President, July 2001- July 2005); (3) Donald Jemison (National Executive Director, 1999-present); and (4) Jimmie Hammock (National Treasurer, July 2003- present). Those witnesses testified to the following facts:[1]

- **Peter Adams:** Mr. Adams testified that in July 1999 he initially gave the defendant the customary authority given to the fraternity's past National Treasurers to use a manual stamp to sign Mr. Adams's name to the fraternity's checks. Mr. Adams testified, however, that he took away Mr. Davis's authority to use the manual stamp at least by January 2001 because of Mr. Adams's concerns with the defendant's performance as Treasurer. Thus, by the beginning of 2001 (the earliest check charged in the Superseding Indictment was January 29, 2001), Mr. Adams testified that the defendant had no authority to stamp (or sign) Mr. Adams's name to the fraternity's checks. In addition, Mr. Adams testified that he never gave authority to

---

[1] Because transcripts of the trial testimony are not available, the facts as set forth in this letter are based on counsel's notes and recollection. The government recently requested copies of the trial transcripts.

the defendant to sign or stamp Mr. Adams's name to checks made payable to cash on the fraternity's account. Mr. Adams testified that he did not become aware until the Summer of 2003 that the defendant had written checks made payable to cash on the fraternity's account, forged Mr. Adams's name on many of those checks and deposited many of the proceeds from the checks into the defendant's personal bank account. Mr. Adams also testified that he did not learn until a few days before trial that the defendant had forged the bank signature cards for the fraternity's general fund account at Industrial Bank and reduced the required number of signatures on the account from two signatures to one signature.

- **Arthur Thomas:** Like Mr. Adams, Mr. Thomas testified that he gave no authority to the defendant to sign Mr. Thomas's name to checks made payable to cash on the fraternity's account or to issue checks made payable to cash on the fraternity's account. Mr. Thomas testified that he did not learn until the Spring of 2003 that the defendant had issued checks made payable to cash on the fraternity's account, forged Mr. Thomas's name to many of the checks, and deposited many of the proceeds from the checks into the defendant's personal bank account. Mr. Thomas also testified that he gave no authority to the defendant to forge Mr. Thomas's name to the bank signature cards for the fraternity's account at Industrial Bank or to reduce the number of required signatures on the fraternity's account from two signatures to one signature. According to Mr. Thomas, he did not learn until a few days before trial that the defendant had forged Mr. Thomas's name to the fraternity's bank signature card and reduced the number of required signatures for the fraternity's account from two signatures to one signature.

- **Donald Jemison:** Like Mr. Thomas, Mr. Jemison testified that he did not learn until the Spring of 2003 that the defendant had issued checks made payable to cash on the fraternity's account, forged the names of the fraternity's National Presidents to many of the checks and deposited many of the proceeds from those checks into the defendant's personal bank account. As with Messrs. Adams and Thomas, Mr. Jemison testified that he did not learn until a few days before trial that the defendant had forged Mr. Jemison's name to the bank signature cards for the fraternity's general fund account at Industrial Bank and reduced the required number of signatures on the account from two signatures to one signature.

- **Jimmie Hammock**: Mr. Hammock, who replaced the defendant as the fraternity's National Treasurer in July 2003, testified that he discussed obtaining the fraternity's financial records, including its bank account statements and canceled checks, with the defendant in July 2003. Mr. Hammock testified that in July 2003 the defendant agreed to mail those financial records to Mr. Hammock. Several weeks later, according to Mr. Hammock, the defendant mailed to Mr. Hammock two boxes of records consisting primarily of unwritten checks and other fraternity officers' reports to the fraternity's board of directors. Mr. Hammock testified that the defendant did

not send him, as requested, the fraternity's bank account statements and canceled checks. Mr. Hammock also testified about a conversation with the defendant after July 2003 in which the defendant stated that he would pay back a small portion of the money he stole from the fraternity in an effort to make the matter "go away."

The government's summary witness, Special Agent Mark Stanley of the Federal Bureau of Investigation, demonstrated that, as part of the scheme to defraud, the defendant wrote approximately $241,000 in checks to cash to which he was not entitled, which he deposited into his personal account or converted to cash or other instruments. This money was then used for the defendant's personal benefit.

## SENTENCING FACTORS

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court shall consider in sentencing a defendant. These factors are discussed below numbered as they are in Section 3553(a).

(1) **The nature of the offense:** The maximum statutory terms of imprisonment at issue here reflect the serious nature of the crimes committed by the defendant. Bank fraud, with a maximum statutory term of 30 years, is a Class B felony. *See* 18 U.S.C. §§ 1344 and 3559(a)(2). Both first-degree theft and first-degree fraud have a maximum statutory term of ten years. *See* 22 D.C. Code §§ 3212(a), 3221(a) and 3222(a)(1).

**The circumstances of the offense:** To serve his own self-aggrandizement, the defendant engaged in a lengthy and brazen scheme to steal from and defraud two financial institutions as well as the fraternity. The theft and fraud encompassed a two and a half-year period during which the defendant illegally obtained approximately $241,000 from the two financial institutions and the fraternity. The defendant's scheme involved false memo items written on many of the checks,

forged checks, forged bank signature cards, and lies to his fraternity brothers concerning the disposition of their funds. His crimes ceased not because of any good conduct on his own part, but rather because his fraternity brothers detected the fraud.

In addition, the offense negatively effected the integrity and perception of integrity of PBS, a fraternal organization founded in 1914. The defendant perverted the essence of a fraternity, particularly one that has proudly emphasized its motto of "Culture for Service, and Service for Humanity." The defendant abused the trust given to him by the general membership as a member and as an elected officer of PBS. In the process, the defendant took the hard-earned money of countless students and alumni – that should have gone to accomplish the good deeds intended by the fraternity's members – and spent it on himself.

**The history and characteristics of the defendant:** The defendant was professionally, emotionally and socially capable of avoiding his criminal conduct, but instead chose to engage in it intentionally and without remorse, acceptance of responsibility or candor. The PSR reflects that the defendant had a stable upbringing, *see* PSR at ¶¶ 42-44, holds a Bachelors degree in accounting, *id.* at ¶ 53, and has no history of physical, mental or emotional health issues, *id.* ¶¶ 48-52. According to the PSR, through March 2002, the defendant held financially secure and upwardly mobile professional positions in Tennessee and Virginia.. *Id.* ¶¶ 62-64. Although the defendant was purportedly self-employed for approximately one year during some period of his criminal conduct, *id.* ¶ 61, there has been no suggestion that this period of self-employment caused the defendant undue financial strain. The defendant, in short, was someone who should have known better than to steal approximately $241,000, and who was capable of either forgoing that money or, if required to support a desired lifestyle, of trying to earn it through hard work.

In addition, the defendant exhibited no character or candor in addressing his theft and fraud once they were detected. Mr. Jemison testified that when he initially confronted the defendant about Mr. Jemison's concerns with the defendant's performance as National Treasurer, the defendant hypocritically accused Mr. Jemison of "showboating." When Mr. Thomas subsequently confronted the defendant with the information obtained by Mr. Thomas that the defendant had cashed a fraternity check, Mr. Thomas testified that the defendant lied to him by stating falsely that the defendant had cashed the check to transfer money between the fraternity's accounts. Likewise, Mr. Hammock testified that when he confronted the defendant with evidence of the theft, the defendant falsely told Mr. Hammock that he had written the checks to cash to transfer money between the fraternity's accounts. Moreover, after Mr. Hammock confronted the defendant with the falsity of the defendant's excuse, Mr. Hammock testified that the defendant suggested that the defendant could re-pay a small portion of the stolen funds to make the matter go away.

The defendant continued to demonstrate his absence of character and candor during the trial. Rather than admit to his theft and fraud, the defendant testified on his own behalf and, in the government's view, lied about his conduct. Whereas the fraternity's officers testified that they knew nothing about and, therefore, did not authorize the forged checks and the forged bank signature cards, the defendant testified that they knew everything about – and authorized – his actions in forging the checks, forging the bank signature cards and depositing the proceeds from many of the forged checks into his personal bank account. The defendant, in effect, accused the fraternity's officers (two of whom have been licensed attorneys for over thirty years) of framing the defendant.

For example, contrary to the testimony of Messrs. Thomas and Adams, the defendant testified that they had authorized him to sign (or stamp) their names to the forged checks made payable to

cash. Other than his own word, however, the defendant offered no evidence to support his claim that the fraternity's officers knew he had issued forged checks made payable to cash. Mr. Thomas's conduct in bringing the forged checks to the attention of law enforcement shortly after their discovery belied the defendant's testimony that the officers had condoned the defendant's practice of forging the fraternity's checks and depositing the proceeds into his personal account.

Contrary also to the testimony of Messrs. Thomas and Adams, the defendant testified that they both knew that he was depositing the proceeds from many of the checks made payable to cash into his personal bank account to reimburse himself for purportedly legitimate fraternity expenses, which Messrs. Thomas and Adams had purportedly approved by initialing receipts for such expenditures. Again, other than his own word, the defendant offered no evidence to support his claim that (1) the fraternity's officers knew the defendant was depositing the proceeds from many of the checks made payable to cash into his personal bank account, or (2) that he spent the proceeds on legitimate fraternity expenses. The false notations that the defendant admitted to hand-writing on many of the checks, such as "payroll transfer" or "ck replacement," belied the defendant's testimony that he did not hide his conduct from his fraternity brothers.

Further, the fraternity's checking account records belied the defendant's contention that he had transferred the proceeds from the forged checks into other fraternity accounts or spent the proceeds on legitimate fraternity expenses. Other than a single personal check made payable to a postage company, the defendant offered no documents or witnesses to corroborate his contention that he spent the proceeds from the checks made payable to cash ($241,000) on legitimate fraternity expenses. More particularly, the defendant called not a single witness to corroborate his contention

that he had spent a substantial portion of the proceeds from the forged checks to pay for other fraternity members' legitimate, fraternity-related travel expenses.

As to the forged bank signature cards, the defendant testified that Messrs. Jemison, Thomas and Adams had authorized him to sign or print their names on the bank signature cards for the fraternity's general fund account at Industrial Bank. He testified that it was an "oversight" on his part that caused him to reduce the number of required signatures on the fraternity's account at Industrial Bank from two signatures to one signature.

The defendant also flatly contradicted the testimony of Jimmie Hammock. The defendant testified that he sent all of the receipts for the purportedly legitimate fraternity-related expenses he had incurred (which the defendant testified had purportedly been initialed by the former National Presidents) to Mr. Hammock following the election of Mr. Hammock as the fraternity's National Treasurer in July 2003. The defendant testified he kept no copies of the records he purportedly sent to Mr. Hammock. Incredibly, the defendant purportedly sent his only copy of those supporting documents to Mr. Hammock at a time when the defendant had already been suspended as National Treasurer by the fraternity and openly questioned about his misuse of the fraternity's funds. The defendant also denied having any conversation with Mr. Hammock in which the defendant suggested that he would pay a portion of the stolen funds back to the fraternity in an effort to make the matter "go away."[2]

---

[2] In the government's view, the defendant also attempted to obstruct justice by (1) suborning perjury through his wife's initial testimony that he had been unemployed during his period of criminal conduct for only a "very brief" or "very short" time, and (2) testifying on his own behalf that he obtained outside income through tax preparation services, whereas the records from the District of Columbia's Office of Employment Services reflected representations by the defendant during the same period that he had no sources of outside income.

(2) The Court should also consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the pubic from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training. In this matter, as discussed above, the offenses were serious and require adequate punishment. The sentence should also be of such a nature so as to deter others from engaging in similar conduct and to protect the public from other criminal acts by the defendant.

Here, deterrence is a particularly important objective. There are huge numbers of volunteer organizations in this community and throughout this country that serve the needs of others. These non-profit organizations depend upon donors to advance their cultural, charitable or social missions. Such organizations generally also depend upon volunteers, such as the defendant, to manage their financial affairs. The negative effects of a corrupt volunteer are not confined to the volunteer's specific organization; instead, such corrupt conduct tends to cast skepticism and, worse, cynicism broadly against non-profit organizations, leading inevitably to a decrease in funding and activity levels for such organizations. As a result, the amount of aid ultimately denied those in need tends to exceed by several magnitudes the amount of money that any one corrupt volunteer selfishly stuffed into his or her own pocket. The defendant's sentence, therefore, should serve as a message to the broader non-profit community that the criminal law will deal harshly with those who seek to profit illegally from their volunteer positions.

As to the final consideration, the defendant does not appear to need further education or vocational training.

(3) The Court should consider the kinds of sentences available. The maximum term of imprisonment for bank fraud is 30 years, with a term of supervised release of not more than 5 years. The maximum term of imprisonment for first-degree theft is 10 years, with a term of supervised release of not more than 3 years. The maximum term of imprisonment for first-degree fraud is 10 years, with a term of supervised release of not more than 3 years.

(4) The Court should also consider the sentencing range established by the United States Sentencing Guidelines ("USSG"). As to these guidelines, the probation officer believes, and the government concurs, that the defendant's resulting Total Adjusted Offense Level for the offense is 22, his Criminal History category is I, and his USSG range is 41 to 51 months. PSR, at p. 7, ¶ 36, and p. 13, ¶ 73. The applicable fine range is $7,500 to $8,000,000. *Id.*, at p. 15, ¶ 91.

(5) The Court should consider any pertinent policy statement issued by the Sentencing Commission. The government is not aware of any pertinent statements beyond those captured in the applicable Sentencing Guidelines range, which is discussed above.

(6) The Court should consider the need to avoid unwarranted sentencing disparities among defendants with similar records. Here, a guidelines sentence would help prevent such disparities between the defendant and similar defendants.

(7) Finally, the Court should consider the need to provide restitution. Here, the defendant should pay restitution of $241,000 to PBS.[3]

---

[3] The initial PSR recommended restitution in the amount of $241,000, but the final PSR recommended restitution in the amount of $221,000 based on information provided by the defense. *See* PSR, at p. 5, ¶ 19 and p. 16, ¶ 95. The government does not believe the materials submitted by the defense demonstrate that the defendant returned any of the proceeds from the forged checks to PBS. As a result, the government recommends restitution in the amount of $241,000.

## **RECOMMENDATION**

During a two and a half-year period, the defendant abused the trust given to him by his fraternity brothers and stole approximately $241,000 from the fraternity. In the process, the defendant defrauded two financial institutions out of that money by forging checks, forging bank signature cards, and lying to his fraternity brothers about his illegal conduct. In the government's view, the defendant compounded those crimes by lying about his conduct when he testified at trial on his own behalf and suborning perjury through his wife's testimony. This is serious conduct that needs to be adequately punished. Bank fraud is among the most serious crimes in the federal system. Theft from a non-profit organization is also a particularly reprehensible act. And lying under oath in an effort to save one's liberty shows a blatant disrespect for the law.

Further, corruption by volunteers, at whatever level, is a serious and, unfortunately, too often recurring matter. Corruption debilitates the public confidence in non-profit organizations, which ultimately harms those most in need of the charitable, cultural and social services provided by such organizations. Citizens will donate their hard-earned money to a volunteer system that they believe operates cleanly, but not to one that they do not believe does so. Moreover, although most volunteers are selfless and honest, their morale is hurt by those who engage in corruption and their reputations suffer.

Throughout this event, the defendant has demonstrated a recurrent refusal to take responsibility for errors and a willingness to blame others for his troubles. To his credit, he had put himself in a position, almost certainly through hard work, to live a lawful and productive life. But when he came to take possession of the fraternity's checkbook in July 1999, which may have been the first time in his life that he had been entrusted with someone else's money, he quickly went

astray. His fraternity brothers, however, gave him an opportunity to explain himself. But, according to them, he responded with prideful denials, untruths, a continuation of his theft and fraud until finally removed as National Treasurer, and a failed, fraudulent effort to buy his way out of the crimes. He took advantage of his opportunity to explain himself in court, and he testified to a new – and equally incredible – version of events in which his fraternity brothers had attempted to frame him and he had spent all of the proceeds from the forged checks ($241,000) on legitimate fraternity expenses. He offered virtually no receipts, no supporting documents and no corroborating witnesses to support his story. Throughout it all, he has resolutely refused to express remorse or accept responsibility for his conduct.

Accordingly, the government requests that the Court impose a sentence at the high end of the guidelines range of 41-51 months. *See United States v. Rita*, ___ U.S. ___, 127 S. Ct. 2456, 2465 (2007) ("when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable"); *United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006) ("a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness" by an appellate court). The government defers to the Court the amount of any fine that the defendant should pay. *See* PSR, at p. 15, ¶ 91 (fine range of $7,500 to $8,000,000), and p. 12, ¶ 69 ("it does not appear that the defendant has the ability to pay a fine in addition to restitution"). The government recommends a term of supervised release of five years and that the defendant pay restitution in the amount of $241,000 to PBS. The government also requests that the Court impose a sentence at the high end of the applicable D.C. Guidelines range of 6-24 months, but leaves to the

Court's discretion whether that sentence should run concurrently or consecutively with the federal offense.

                                              Respectfully submitted,

                                              JEFFREY A. TAYLOR
                                              UNITED STATES ATTORNEY
                                              D.C. Bar Number 498610

By:          / s /
                                              _____
                                              MICHAEL K. ATKINSON
                                              D.C. Bar No. 430517
                                              Assistant United States Attorney
                                              555 4th Street, N.W., Room 5915
                                              Washington, D.C. 20530
                                              (202) 616-3702

DATED: July 27, 2007                      Michael.Atkinson2@usdoj.gov