HONORABLE REGGIE B. WALTON, UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Docket No.: <u>CR-06-193-01</u> |
| | : | |
| vs. | : | SSN: |
| | : | |
| DAVIS, Terry | : | Disclosure Date: <u>June 22, 2007</u> |

AUG   7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## RECEIPT AND ACKNOWLEDGMENT OF
## PRESENTENCE INVESTIGATION REPORT

This is to acknowledge that each of the undersigned has received and reviewed the Presentence Investigation Report (PSR) in the above-entitled case. The undersigned further acknowledges that:

**For the Government**
(CHECK APPROPRIATE BOX)
( )  There are no material/factual inaccuracies therein.
(✓)  There are material/factual inaccuracies in the PSI report as set forth in the attachment herein.

_____                    8·7·07
**Prosecuting Attorney**                              **Date**

**For the Defendant**
(CHECK APPROPRIATE BOX)
( )  There are no material/factual inaccuracies therein.
( )  There are material/factual inaccuracies in the PSI report as set forth in the attachment.

_____        _____
**Defendant**        **Date**                    **Defense Counsel**        **Date**

### NOTICE OF OBLIGATION OF THOSE EXECUTING THIS FORM

Pursuant to Local Rule 32(f)(2), those executing this form shall first submit any material inaccuracies or disputes in writing by <u>July 6, 2007</u>, to U.S. Probation Officer **Monica Johnson**, telephone number <u>(202) 565-1332</u>, fax number <u>(202) 273-0242</u>.

Pursuant to Rule 32(b)(6)(B), effective December 1, 1994, it shall be the responsibility of the Attorney for the Government and the Defense Counsel to provide each other with a copy of the objections at the same time the objections are filed with the probation office.

**FOR THE COURT**

By:   Gennine A. Hagar, Chief
      United States Probation Officer



U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

Writer's Direct Dial: 202-616-370?

July 6, 2007

**VIA FACSIMILE (202-273-0242)**

Monica Johnson
United States Probation Officer
333 Constitution Avenue, N.W.
Washington, D.C. 2001

   Re: *United States v. Terry Davis,*
     **Presentence Investigation Report, Docket No.: CR-06-193-01**

Dear Ms. Johnson:

  The Government has received the Presentence Investigation Report ("PSI") regarding Terry Davis and has identified the following material/factual inaccuracies:

  **Paragraph 20**: The PSI states that the "Probation Office received no information to suggest that the defendant impeded or obstructed justice." This is to inform you that, in the government's view, the defendant obstructed justice by both testifying falsely at the trial on his own behalf and suborning perjury through the testimony of his wife, Rhonda Davis. In the government's view, this obstructive conduct related to the defendant's offenses of conviction. As a result, the government seeks a two-point upward enhancement for obstruction of justice. *See* United States Sentencing Guidelines ("U.S.S.G.") § 3C1.1 (Nov. 2006).

  A two-level upward adjustment may be given for obstructing or impeding the administration of justice where the Court finds that:

> the defendant willfully obstructed or impeded, or attempted to
> obstruct or impede, the administration of justice during the course
> of the investigation, prosecution or sentencing of the instant
> offense of conviction, and . . . the obstructive conduct related to . . .
> the defendant's offense of conviction and any relevant conduct.

U.S.S.G. § 3C1.1. The Application Notes specify that this Section applies to "committing, suborning, or attempting to suborn perjury." *Id.*,comment, n.4(b) (Nov. 2006). Perjury for

purposes of Section 3C1.1 is the same as perjury under the federal perjury statute, 18 U.S.C. § 1621. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). It occurs where a "witness testifying under oath . . . gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.*

In the government's case-in-chief, it called four former or current officers of Phi Beta Sigma: (1) Peter Adams (National President, July 1997- July 2001); (2) Arthur Thomas (National President, July 2001- July 2005); (3) Donald Jemison (National Executive Director, 1999-present); and (4) Jimmie Hammock (National Treasurer, July 2003- July 2007). Those witnesses testified to the following facts:[1]

- **Peter Adams:** Mr. Adams testified that in July 1999 he initially gave the defendant the customary authority given to the fraternity's past National Treasurers to use a manual stamp to sign Mr. Adams's name to the fraternity's checks. Mr. Adams testified, however, that he took away Mr. Davis's authority to use the manual stamp at least by January 2001 because of Mr. Adams's concerns with the defendant's performance as Treasurer. Thus, by the beginning of 2001 (the earliest check charged in the Indictment was January 29, 2001), Mr. Adams testified that the defendant had no authority to stamp (or sign) Mr. Adams's name to the fraternity's checks. In addition, Mr. Adams testified that he never gave authority to the defendant to sign or stamp Mr. Adams's name to checks made payable to cash on the fraternity's account. Mr. Adams testified that he did not become aware until the Summer of 2003 that the defendant had written checks made payable to cash on the fraternity's account, forged Mr. Adams's name on many of those checks and deposited many of the proceeds from the checks into the defendant's personal bank account. Mr. Adams also testified that he did not learn until a few days before trial that the defendant had forged the bank signature cards for the fraternity's general fund account at Industrial Bank and reduced the required number of signatures on the account from two signatures to one signature.

- **Arthur Thomas:** Like Mr. Adams, Mr. Thomas testified that he gave no authority to the defendant to sign Mr. Thomas's name to checks made payable to cash on the fraternity's account or to issue checks made payable to cash on the fraternity's account. Mr. Thomas testified that he did not learn until the Spring of 2003 that the defendant had issued checks made payable to cash on the fraternity's account, forged Mr. Thomas's name to many of the checks, and deposited many of the proceeds from the checks into the defendant's personal bank account. Mr. Thomas also testified that he gave no authority to the defendant to forge Mr. Thomas's name to the bank signature cards for the fraternity's account at Industrial Bank or to reduce the number of required signatures on the fraternity's account from two signatures to one signature. According to Mr. Thomas, he did

---

[1] Because transcripts of the trial testimony are not available, the facts as set forth in this letter are based on counsel's notes and recollection. The government recently requested copies of the trial transcripts.

2

not learn until a few days before trial that the defendant had forged Mr. Thomas's name to the fraternity's bank signature card and reduced the number of required signatures for the fraternity's account from two signatures to one signature.

- **Donald Jemison:** Like Mr. Thomas, Mr. Jemison testified that he did not learn until the Spring of 2003 that the defendant had issued checks made payable to cash on the fraternity's account, forged the names of the fraternity's National Presidents to many of the checks and deposited many of the proceeds from those checks into the defendant's personal bank account. As with Messrs. Adams and Thomas, Mr. Jemison testified that he did not learn until a few days before trial that the defendant had forged Mr. Jemison's name to the bank signature cards for the fraternity's general fund account at Industrial Bank and reduced the required number of signatures on the account from two signatures to one signature.

- **Jimmie Hammock:** Mr. Hammock, who replaced the defendant as the fraternity's National Treasurer in July 2003, testified that he discussed obtaining the fraternity's financial records, including its bank account statements and canceled checks, with the defendant in July 2003. Mr. Hammock testified that in July 2003 the defendant agreed to mail those financial records to Mr. Hammock. Several weeks later, according to Mr. Hammock, the defendant mailed to Mr. Hammock two boxes of records consisting primarily of unwritten checks and other fraternity officers' reports to the fraternity's board of directors. Mr. Hammock testified that the defendant did not send him, as requested, the fraternity's bank account statements and canceled checks. Mr. Hammock also testified about a conversation with the defendant after July 2003 in which the defendant stated that he would pay back a small portion of the money he stole from the fraternity in an effort to make the matter "go away."

In an effort to rebut the government's witnesses, the defendant testified on his own behalf. Whereas the fraternity's officers testified that they knew nothing about and, therefore, did not authorize the forged checks and the forged bank signature cards, the defendant testified that they knew everything about – and authorized – his actions in forging the checks, forging the bank signature cards and depositing the proceeds from many of the forged checks into his personal bank account. The defendant, in effect, accused the fraternity's officers (two of whom have been licensed attorneys for over thirty years) of framing the defendant.

For example, contrary to the testimony of Messrs. Thomas and Adams, the defendant testified that they had authorized him to sign (or stamp) their names to the forged checks made payable to cash. Other than his own word, however, the defendant offered no evidence to support his claim that the fraternity's officers knew he had issued forged checks made payable to cash. Mr. Thomas's conduct in bringing the forged checks to the attention of law enforcement shortly after their discovery belied the defendant's testimony that the officers had condoned the defendant's practice of forging the fraternity's checks and depositing the proceeds into his personal account.

Contrary also to the testimony of Messrs. Thomas and Adams, the defendant testified that they both knew that he was depositing the proceeds from many of the checks made payable to

3

cash into his personal bank account to reimburse himself for purportedly legitimate fraternity expenses, which Messrs. Thomas and Adams had purportedly approved by initialing receipts for such expenditures. Again, other than his own word, the defendant offered no evidence to support his claim that (1) the fraternity's officers knew the defendant was depositing the proceeds from many of the checks made payable to cash into his personal bank account, or (2) that he spent the proceeds on legitimate fraternity expenses. The false notations that the defendant admitted to hand-writing on many of the checks, such as "payroll transfer" or "ck replacement," belied the defendant's testimony that he did not hide his conduct from his fraternity brothers.

Further, the fraternity's checking account records belied the defendant's contention that he had transferred the proceeds from the forged checks into other fraternity accounts or spent the proceeds on legitimate fraternity expenses. Other than a single personal check made payable to a postage company, the defendant offered no documents or witnesses to corroborate his contention that he spent the proceeds from the checks made payable to cash ($241,000) on legitimate fraternity expenses. More particularly, the defendant called not a single witness to corroborate his contention that he had spent a substantial portion of the proceeds from the forged checks to pay for other fraternity members' legitimate, fraternity-related travel expenses.

As to the forged bank signature cards, the defendant testified that Messrs. Jemison, Thomas and Adams had authorized him to sign or print their names on the bank signature cards for the fraternity's general fund account at Industrial Bank. He testified that it was an "oversight" on his part that caused him to reduce the number of required signatures on the fraternity's account at Industrial Bank from two signatures to one signature.

The defendant also flatly contradicted the testimony of Jimmie Hammock. The defendant testified that he sent all of the receipts for the purportedly legitimate fraternity-related expenses he had incurred (which the defendant testified had purportedly been initialed by the former National Presidents) to Mr. Hammock following the election of Mr. Hammock as the fraternity's National Treasurer in July 2003. The defendant testified he kept no copies of the records he purportedly sent to Mr. Hammock. Incredibly, the defendant purportedly sent his only copy of those supporting documents to Mr. Hammock at a time when the defendant had already been suspended as National Treasurer by the fraternity and openly questioned about his misuse of the fraternity's funds. The defendant also denied having any conversation with Hammock in which the defendant suggested that he would pay a portion of the stolen funds back to the fraternity in an effort to make the matter "go away."

In his defense, the defendant also called his wife, Rhonda Davis. She testified, among other things, that the standard of living enjoyed by the Davises did not change between January 2001 and June 2003, i.e., the time period during which the defendant obtained an extra $241,000 in funds by forging the fraternity's checks made payable to cash. Her testimony was designed presumably to support her husband's theory of defense that he spent the $241,000 on legitimate fraternity expenses. By testifying that their standard of living did not change during the time period that he obtained $241,000 from the fraternity's funds, the jury could infer that the defendant (and his wife) did not spend that money on themselves. Such an inference would only be possible, however, if the Davises' standard of living, i.e., the amount of money they spent on themselves, remained stable during the time period of January 2001 through June 2003.

4

Consistent with that inference, Mrs. Davis testified on direct examination that during the time period between January 2001 and June 2003, the defendant had left his job in Washington, D.C. at Trizec Hahn (a property management firm) for a job in Memphis, Tennessee. On direct examination, she was not asked about – and did not mention – any period of unemployment experienced by her husband between his job in Washington, D.C. and his new position in Memphis, Tennessee. Thus, the jury was left with the false impression that the defendant had experienced no irregularity in his employment that might impact his (and her) standard of living during the relevant time period.

On cross-examination, Mrs. Davis testified that, during the two and a half year period when their standard of living did not change, she worked in part-time, temporary positions until she obtained full-time employment in the Fall of 2002. She also testified that she was unaware of any other source of income received by her husband during the time period between when he left his job at Trizec Hahn and started his new position in Memphis, Tennessee. She initially testified on cross-examination that her husband had been unemployed between the time that he left his job at Trizec Hahn and started his new job in Memphis for a "very short" or "very brief" period of time. Following a bench conference, during which the government expressed its intent to confront her with copies of benefits checks received by her husband from the District of Columbia Department of Employment Services for the period from May 2002 through January 2003, Mrs. Davis testified that she knew her husband had been unemployed for several months before obtaining his new job in Memphis, Tennessee.[2] Mrs. Davis did not explain how the Davises were able to maintain their standard of living during a time when her husband was unemployed for several months and she had no full-time employment.[3]

The defendant followed his wife on the stand and attempted to fill the void left by his wife's testimony regarding their purportedly unchanged standard of living. Apparently having observed his wife's remarkable testimony that their standard of living had not changed during a time period when he went from being fully employed to unemployed while she remained in part-time positions, the defendant testified that he had earned income during his period of unemployment through a severance from his former employer (Trizec Hahn) and his preparation of tax returns. The defendant offered no documentary support for his testimony about his purported severance or income from his tax preparation services.[4] His testimony about his outside income from the tax preparation services contradicted his wife's testimony that he had no other employment income between his job at Trizec Hahn and his move to Memphis, Tennessee.

---

[2] According to the PSR, there was a one year gap between the defendant's employment at Trizec Hahn, which ended in March 2002 (see PSR ¶ 60), and the start of his job for the City of Memphis, which began in March 2003 (see PSR ¶ 58).

[3] Notably, during his closing argument, the defendant's counsel did not mention the wife's testimony.

[4] According to the PSR, the defendant now maintains that he made "approximately $10,000 per year" by preparing the tax returns. See PSR ¶ 59. Even now, however, the defendant has apparently offered no evidence to support his claim that he earned approximately $10,000 by preparing tax returns.

5

His testimony also contradicted the records of the District of Columbia Department of Employment Services that reflected, among other things, that he had represented to them that he had no outside income, including a severance, during the period from April 2002 through January 2003.[5]

As a result, the government contends that the defendant perjured himself and suborned perjury related to the following material facts: (1) the defendant had authority to issue checks made payable to cash on the fraternity's accounts, (2) the defendant had authority to forge the names of the fraternity's National Presidents on the checks made payable to cash on the fraternity's accounts, (3) the fraternity's officers knew that the defendant issued checks made payable to cash on the fraternity's account, forged the names of the National Presidents on many of those checks and deposited many of the proceeds from those checks into his personal bank account, (4) the defendant had authority to forge the names of the fraternity's officers to the bank signature cards for the fraternity's general fund account at Industrial Bank, (5) the defendant provided the fraternity with the financial records, specifically the canceled checks and account statements, requested of him by the fraternity, (6) the defendant spent the $241,000 obtained from the checks made payable to cash on legitimate fraternity expenses; (7) the defendant had no communications with Mr. Hammock after July 2003, (8) the defendant was not unemployed for any substantial period between March 2002 and March 2003, and (9) the defendant received outside income between March 2002 and March 2003.

**Paragraph 30:** As stated above, the government contends that a two-point upward enhancement for obstruction of justice is appropriate.

**Paragraph 34:** As stated above, the government contends that, with the two-point upward enhancement for obstruction of justice, the total offense level should be 23.

**Paragraph 35:** The PSR erroneously refers to Count 11 as a misdemeanor. As the PSR correctly stated in paragraphs 2 and 4, the defendant was charged with and convicted of Theft in the First Degree. Theft in the First Degree is a felony. See D.C. Code § 3212(a) ("Any person convicted of theft in the first degree shall be fined not more than $5,000 or imprisoned for not more than 10 years, or both, if the value of the property obtained or used is $250 or more.").

**Paragraph 59:** The PSR's statement that the defendant was unemployed from March 2002 until August 2003 appears to be erroneous based upon the employment information stated in paragraph 58. It appears that the PSR may have intended to state that the defendant was self-employed, rather than unemployed, during that time period.

---

[5] Copies of the benefits checks from the Department of Employment Services to the defendant have been filed with the Court and are available for your review. A copy of the summary sheet on file at the Department of Employment Services reflecting the defendant's representations to the Department of Employment Services that he had no outside income, including a severance, between April 2002 and January 2003 was also filed with Court and is available for your review.

**Paragraph 69:** As stated above regarding paragraph 35, Count 11 is a felony and the maximum term of imprisonment is 10 years. *See* D.C. Code § 3212(a).

**Paragraph 71:** As stated above, the government contends that, with the two-point upward enhancement for obstruction of justice, the total offense level should be 23 and the guideline range (with a criminal history category 1) is 46-57 months.

**Paragraph 73:** As stated above regarding paragraph 35, Count 11 is a felony and the DC sentencing guidelines should apply.

**Paragraph 75:** Because Count 11 is a felony, the same supervised release conditions should apply to Count 11 as they do to Count 12.

If you have any questions or need additional information, please let me know. As always, thank you for your assistance in this matter.

Truly yours,

JEFFREY A. TAYLOR

Michael K. Atkinson
Assistant United States Attorney

cc:   Tony L. Axam, Esquire (via facsimile - 202-208-7515)
      Joshua A. Klein, Esquire (via facsimile - 202-585-1015)